**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**IN NASHVILLE**

| | | |
|---|---|---|
| **TENNESSEE WALKING HORSE** | ) | |
| **BREEDERS' AND EXHIBITORS'** | ) | |
| **ASSOCIATION,** | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:05-0088** |
| | ) | **Judge Campbell** |
| **NATIONAL WALKING HORSE** | ) | **Magistrate Judge Knowles** |
| **ASSOCIATION,** | ) | |
| | ) | |
|     **Defendant.** | ) | |

---

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

## I. INTRODUCTION

This is the case about a defendant that is reaping what it has not sown. Rather than invest the money and time that it takes to develop a high quality product/service, Defendant has merely copied and misappropriated Plaintiff's intellectual property. Whereas Plaintiff has invested millions of dollars and countless hours since its establishment in 1935, Defendant entered the marketplace in 2004 with a competing product/service, and had the audacity to explicitly invite the public to provide copies of registration papers issued by Plaintiff when applying for registration with Defendant. Defendant never asked Plaintiff for permission. Shockingly, Defendant continues through today to reap what it has not sown, even despite Plaintiff's lawsuit.

This case is about the efforts Plaintiff has taken to select, identify and protect the pedigrees of the Tennessee Walking Horse (sometimes "the Breed"), and about Defendant's misappropriation of the fruits of Plaintiff's labor. In 1935, Plaintiff's founding members

established a registry to track the lineage of those horses that best represented the Breed (the "Registry"). They selected certain physical traits that had to be present in order to be registered, from a horse's gait, to the markings on the inside of its knees. For over 70 years, Plaintiff has protected this information, refining the selection criteria as the Breed has evolved. Through its Registry, Plaintiff has helped maintain the quality of the Breed, ensuring that only true offspring are permitted to register.

Irrelevant to this motion is the argument Defendant is anticipated to make: that it established a competing registry to direct money away from Plaintiff because of a disagreement over the soring of horses. In reality, neither party condones soring.[1] Also irrelevant is Defendant's anticipated argument that Plaintiff's Registry is nothing more than a compilation of facts, which are not protected as intellectual property. But unlike a telephone book, which records rote information and involves no originality or selection, a Registration Certificate issued by Plaintiff indicates that a horse is of a premium quality and that its lineage can be traced back to the foundation horses of the Tennessee Walking Horse Breeders' and Exhibitors' Association from 1935. The quality assurance that Plaintiff's registry offers the marketplace is demonstrated by the fact that Defendant's president continued to register his horses with Plaintiff even after Defendant launched its own registry.

In addition to all of the above, it should be noted that Plaintiff's Registry has received protection from the U.S. Copyright Office. And its design mark, which incorporates its acronym – TWHBEA – has received protection from the U.S. Patent & Trademark Office.

---

[1] Deposition of Sharon Brandon at 13 (Ms. Brandon is the Secretary/Treasurer of TWHBEA, and has worked there since August 1962).

## II.  PLAINTIFF SEEKS PARTIAL SUMMARY JUDGMENT

Plaintiff, Tennessee Walking Horse Breeders' and Exhibitors' Association ("Plaintiff" or "TWHBEA," pronounced "Twee-Bah"), seeks partial summary judgment on three of its claims:

(A) Trademark Infringement, in violation of 15 U.S.C. § 1114(1);

(B) Unfair Competition, in violation of 15 U.S.C. § 1125(a), federal common law, and Tenn. Code Ann. § 47-18-104 (the Tennessee Consumer Protection Act); and

(C) Copyright Infringement, in violation of 17 U.S.C. §§ 101 *et seq.*

TWHBEA also seeks summary judgment on three of the affirmative defenses raised by Defendant: statute of limitations, laches and estoppel.  TWHBEA does not seek summary judgment on its claims of Intentional Interference with Business Relations or Trademark Dilution.  Plaintiff respectfully submits that permanent injunctive relief is appropriate at this stage and that, if it succeeds here in establishing liability against Defendant on the above claims, damages may be assessed against Defendant at a later hearing or at trial.

## III. RELEVANT BACKGROUND[2]

TWHBEA & Its Registry of Tennessee Walking Horse Ancestry

In 1935, Plaintiff created and established a registry to record the pedigrees of Tennessee Walking Horses ("the TWHBEA Registry").[3]  The TWHBEA Registry contains over 70 years' worth of unbroken ancestral lineage records for Tennessee Walking Horses.  TWHBEA's leaders

---

[2] All documents referenced with the prefix "TWH/NWH" have been previously produced by TWHBEA in response to NWHA's Requests for Production or in initial disclosures.  All documents referenced with the prefix "NWHA" were produced by NWHA in response to TWHBEA' Requests for Production.

[3] Complaint ¶ 14; Deposition of Sharon Brandon at 8-12; TWH/NWH 4928-4931 (Constitution & Bylaws, reflecting first meeting of TWHBEA held on April 27, 1935 "to collect, record, and preserve the pedigrees of walking horses, and the publication of a Register or Stud Book . . . and such other matters pertaining to the breeding, exhibiting and sale of walking horses . . . ." (specific reference from TWH/NWH 4931)); Deposition of TWHBEA's 30(b)(6) witness, Jerrold Pedigo[3] ("Pedigo 30(b)(6)") at 16-17, 25.

{00175240.2}

gathered an initial group of foundation horses, from which all TWHBEA-registered horses have descended.[4] As the compiler noted in the preface to the initial Stud Book in 1938:

> The immense commercial value of the Tennessee Walking Horse, and the large number seeking to breed and develop him, in connection with the well-established and now generally conceded fact that the best Walking Horses belong to certain families, have prompted the Tennessee Walking Horse Breeders' Association of America[5] to undertake the very difficult task of showing what combinations of blood he possesses. . . .
>
> . . . .
>
> I have sought information from all sources available which gave promise of help.
>
> The Walking Horse has a history with a record running back more than one hundred years. Hence, the obscurity which envelopes the breeding of some of our most distinguished foundation stock, and the difficulties which lie in the way of the compiler.
>
> [] The foundation of a registration for Walking Horses had to be laid, and its construction has been confined to such material as was at hand. Owners were often uncertain of the pedigrees of their stock and were oftentimes driven for facts to the bills of stallion owners, carelessly prepared as to pedigrees, and probably occasionally incorrect. It has been the purpose of the compiler to straighten out these tangled pedigrees as far as possible. . . .
>
> . . . .
>
> [] From the starting point of this registration the great Walking Horse interests can be built up and maintained throughout all time.[6]

Every single horse that is registered with TWHBEA has its Registration Certificate on file with TWHBEA, showing an unbroken chain since TWHBEA's founding in 1935.[7] As of November 13, 2006, TWHBEA had approximately 430,000 horses in its Registry,[8] giving it a market share of 98% of registered Tennessee Walking Horses.[9]

As of July 19, 2006, TWHBEA had approximately 18,000 members[10], and as of August 30, 2006, TWHBEA had invested approximately $14,500,000 (actual dollars, not adjusted for

---

[4] Pedigo 30(b)(6) dep. at 9-10, 16; see also Introduction to Initial Stud Book, from 1938 (TWH/NWH 4928-4961).
[5] This is a former name of TWHBEA.
[6] TWH/NWH 4949, 4952.
[7] Brandon decl. at ¶ 3; see generally Brandon dep. at 66.
[8] Brandon decl. at ¶ 4.
[9] Declaration of Glenn Perdue, one of TWHBEA's experts, at ¶ 9.
[10] Pedigo 30(b)(6) dep. at 58.

inflation) in its Registry, and $63.5 million total in developing the TWHBEA Registry, brand, breed and industry since 1935.[11]

Evolution of TWHBEA Selection Criteria

TWHBEA issues ownership and pedigree certificates based on a horse's satisfaction of the selection criteria, including establishment that the horse is a pure-bred Tennessee Walking Horse ("TWHBEA Registry Certificates").[12] The original Constitution and Bylaws of TWHBEA, adopted in 1935, set forth rules that govern eligibility for registration in the TWHBEA Registry (TWH/NWH 4928-4937 (Art. XIV)), and the 1938 Registry included specific criteria for inclusion, including specific colors, markings on the legs, body, head, mane and tail.[13]

Over time, TWHBEA's selection criteria have evolved. For example, in 1974, TWHBEA researched and discussed the use of photographs of the horses' night eyes, or chestnuts, for purposes of positive identification and including the photographs in the application for registration.[14] For example, TWHBEA's chart of colors and markings from 1999 includes some different color selections from the 1990 chart, and the 2006 chart includes different colors from the 1999 chart, even still.[15]

As part of TWHBEA's selection process, TWHBEA determines through a blood test whether a horse that is applying for registration with TWHBEA is pure-bred, and checks to see whether both its sire and dam and older ancestors are registered with TWHBEA.[16] TWHBEA would reject the application from any horse that either fails to satisfy the blood test, or that has a

---

[11] Perdue decl. at ¶ 6.
[12] Brandon dep. at 10.
[13] TWH/NWH 4962-63.
[14] TWH/NWH 2267 and 2275.
[15] See Brandon decl. at ¶¶ 7-8, attaching summary of color charts; TWH/NWH 6472-6488 (1990 color chart); TWH/NWH 6489-6504 (1999 color chart); TWH/NWH 6505-6520 (2006 color chart).
[16] Brandon decl. ¶ 5.

sire or dam that is not already registered with TWHBEA.[17]  This ensures that the lineage in

TWHBEA's database remains unbroken.[18]

<u>TWHBEA's Registry Guards the Purity of the Breed</u>

From the earliest periods in the history of TWHBEA, its leaders protected the lineage of

the Tennessee Walking Horse.  For example, the April 18, 1939 TWHBEA Executive

Committee minutes record the decision to investigate the pedigree of the original TWHBEA

foundation horse, Allan F-1.[19]

Later, in efforts to further protect the purity of the Breed, in 1985, TWHBEA required

that all stallions born January 1, 1985, or later, be blood-typed before any offspring could be

registered with TWHBEA, and that the blood-typing results be permanently recorded with

TWHBEA.[20]  In 1994, TWHBEA offered its members the ability to positively identify their

horses with an imbedded microchip number, in addition to undergoing blood-typing.[21]  And in

2001, TWHBEA began discussing DNA testing as a means of parentage verification, in addition

to (and eventually as a possible substitute for) blood-typing.[22]

<u>TWHBEA's Copyrights & Registration of its Copyrights</u>

TWHBEA has registered its copyright in the TWHBEA Registry with the United States

Copyright Office ("the Copyright Office").[23]  Further, TWHBEA's copyright notice has

---

[17] Brandon decl. ¶ 5.
[18] Brandon decl. ¶ 5.
[19] TWH/NWH 0902.
[20] TWH/NWH 2775.
[21] TWH/NWH 3611, 3619.
[22] TWH/NWH 4374.
[23] Complaint & Answer ¶ 21 (Registration Numbers TXu-67-928, TXu-91-028, TXu-131-889, TXu-155-041, TXu-200-340, TXu-231-014, TXu-231-016, TXu-272-088, TXu272-518, TXu-316-329, TXu-372-371 and TXu-470-460) (copies of the certificates of which are attached at Exhibit A to the Complaint); TWH/NWH 0081-0082 (Registration Number TX 6-295-177).

appeared on its applications for Registration continuously since 1979,[24] in its rule books continuously since before 1994,[25] and on its Registry Certificates.[26]

<u>TWHBEA's Trademarks & Registration of its Design Mark</u>

TWHBEA has priority with regard to its three service-marks, continuously using them in interstate commerce in connection with maintenance of the TWHBEA Registry, sporting events and competitions for the Tennessee Walking Horse, and informational services, printed materials and publications in the field of the Tennessee Walking Horse, one of them since 1974 ("TENNESSEE WALKING HORSE BREEDERS' AND EXHIBITORS' ASSOCIATION"),[27] and two others since May 30, 1992 ("TWHBEA"[28] and "the TWHBEA Design Mark,"[29] a copy of which is attached hereto as Exhibit 1) (collectively "the TWHBEA Marks").

Since as early as July 1, 2002, TWHBEA has continuously and exclusively used the TWHBEA Marks in interstate commerce in connection with on-line informational services, computerized communications services and on-line retail store services in the field of the Tennessee Walking Horse.[30]  The United States Patent and Trademark Office issued registration of the "TWHBEA Design Mark," in connection with maintenance of the TWHBEA Registry, on January 31, 1995.[31]

<u>NWHA Established a Registry</u>

NWHA was founded in 1998, and at the time it did not possess a database of pedigrees of the Tennessee Walking Horse.[32]  Nevertheless, in approximately July 2004[33], NWHA

---

[24] TWH/NWH 5913-5914, 6014-6034 and 6046-6052.
[25] <u>See</u> Rule 16 of undated Bylaws and Rules (TWH/NWH 5872-5883); Rule 18 of 1994 revision (TWH/NWH 0736-0749); Rule 19 of 1998 revision (TWH/NWH 5884-5893); Rule 19 of 2000 revision (TWH/NWH 5894-5902); Rule 19 of 2003 revision (TWH/NWH 5903-5912); and Rule 19 of 2005 revision (TWH/NWH 0680-0691).
[26] <u>See e.g.,</u> Dep. Ex. 32 (TWHBEA Registration Certificate for Count's Mighty Razmataz).
[27] Brandon decl. at ¶ 9.
[28] Brandon decl. at ¶ 10.
[29] Brandon decl. at ¶ 11.
[30] Brandon decl. at ¶ 12.
[31] Complaint & Answer ¶ 32 (Registration Number 1,876,853).

established a registry on its website <www.nwha.com> ("the NWHA Website") that provides ancestral lineage information of Tennessee Walking Horses ("the NWHA Registry")[34], and from which NWHA issues certificates of pedigree and ownership registration for Tennessee Walking Horses ("the NWHA Certificates").[35]

As of July 21, 2006, NWHA had received 164 applications from owners to register their horse(s) with NWHA, 158 (or 96%) of which attached a TWHBEA Registry Certificate to their NWHA application.[36] Each of the 158 NWHA Registry Certificates lists 31 total horses (the horse in question, plus 30 of its ancestors), which when multiplied together produces a maximum possibility of 4,898 TWHBEA-registered horses whose lineage has been copied by NWHA through just these 158 applications.[37]

Separately, as of August 22, 2006, the NWHA online database at <www.nwha.com/search.html> ("NWHA Website") included 5,788 entries, 5,014 (or 87%) of which are TWHBEA-registered horses.[38]

## NWHA Encouraged the Public to Submit TWHBEA Registry Certificates When Applying with NWHA

From the time NWHA first launched its Registry on the NWHA Website in July 2004 through December 25, 2005, it encouraged the public to submit TWHBEA registration papers when applying to register with NWHA.[39]

---

[32] Complaint & Answer ¶¶ 36 & 45.
[33] Deposition of Debbie Nuding (NWHA's Registry database administrator) at 8.
[34] Complaint & Answer ¶¶ 46-47.
[35] Complaint & Answer ¶ 48.
[36] Declaration of Glenn Perdue at ¶ 4 (Glenn Perdue serves as one of TWHBEA's expert witnesses) (his report cited NWHA 0353-1382, which are copies of the 164 NWHA Registry Certificates that NWHA produced in response to TWHBEA's Second Req. for Prod. No. 15, along with each corresponding application, 158 of which attached a TWHBEA Registry Certificate – *only copies of representative ones are attached to this motion, filed with Ex. 2 hereto* ).
[37] Perdue decl. at ¶ 4.
[38] Perdue decl. at ¶ 5.

From July 2004 through December 25, 2005, the NWHA Website stated[40]:

      A.     "NWHA is now accepting Tennessee Walking Horse Breeders and Exhibitors Association (TWHBEA) . . . registered Walking Horses with current registration papers for registration with NWHA."[41]

      B.     "Blood typing and parentage verification on horses that are currently registered with TWHBEA . . . will be accepted."

      C.     "A code will be added to every horse that is registered with [NWHA] that will denote how each horse entered the registry (example: TWHBEA horses will carry the letter "T")."[42]

      D.     "Be sure to send copies of both sides of TWHBEA . . . registration certificates with application to register with NWHA."

      E.     "Copies of TWHBEA or CRTWH registration papers MUST accompany registration."[43]

From July 2004 through December 25, 2005, the NWHA Website included no disclaimer explaining that TWHBEA did not endorse or condone NWHA's use of TWHBEA's trademarks.[44]  Importantly, at no time has NWHA ever asked TWHBEA for permission to use the TWHBEA Marks or the TWHBEA Registry.[45]

NWHA Later Removed references to TWHBEA, But Continues to Accept TWHBEA Registry Certificates

Only after TWHBEA filed this suit against NWHA on December 2, 2005,[46] did NWHA eventually remove all references to TWHBEA from the NWHA Website, on approximately

---

[39] Deposition of Don Bell at 68 (Don Bell served as NWHA's 30(b)(6) representative, per  Bell dep. at 27); Nuding dep. at 9-10; see also Complaint & Answer ¶ 51.  Copies of the representative pages of the NWHA Website are attached to the Complaint at Exhibit E.
[40] Ex. E to Complaint (Doc. 1-6) (Printout from NWHA Website, dated 11/29/05).
[41] Nuding dep. at 39.
[42] Nuding dep. at 40.
[43] Nuding dep. at 42 (emphasis in original).
[44] Ex. E to Complaint (Doc. 1-6) (Printout from NWHA Website, dated 11/29/05).
[45] Bell dep. at 120.
[46] Complaint.

December 26, 2005.[47]  Despite removing the explicit references to TWHBEA, NWHA continues to accept TWHBEA Registry Certificates[48], and it has no intention to stop doing so.[49]

<u>NWHA Uses TWHBEA Registration Papers to Obtain Information for its own Registry</u>

NWHA's application for registration contains no space to list a horse's pedigree.[50]  The sole source from which NWHA obtains a horse's pedigree is from the certificate of TWHBEA or the Canadian registry, unless that horse's pedigree is contained in a package of "canned software" that NWHA purchased for $100 when initially launching its Website.[51]

NWHA copies information directly from TWHBEA certificates.  As demonstration of this, the NWHA Registry has copied and denoted unique designations that TWHBEA has historically assigned to its horses, such as "F-38," which designates a horse was the 38th foundation horse in the TWHBEA Registry.[52]

NWHA's copying is also evident where NWHA noted the exact same horse color or marking on the NWHA Registry Certificate as on the TWHBEA Registry Certificate attached to the application, but where the NWHA application itself was silent as to the color or marking, or where the applicant listed one color or marking, but NWHA ignored that and instead copied the color or marking verbatim from the attached TWHBEA Registry Certificate.  <u>See</u>. Ex. 2[53]

---

[47] Bell Dep. at 68-71; Dep. Ex. 18.
[48] Bell dep. at 71, 118; Nuding dep. at 56-58.
[49] Bell dep. at 79.
[50] Bell dep. at 111.
[51] Bell dep. at 111-13; Bell dep. at 81 (explaining that NWHA voted to accept pedigree certificates from only two registries: TWHBEA and the Canadian registry).
[52] Brandon Decl. at ¶ 6; <u>Compare</u> TWHBEA original Registry (TWH/NWH 4953-4463), <u>with</u> Pedigree of Hals Happy Spirit NWHA Tracking Registry # 19890003, printed off the NWHA Registry on May 16, 2006 (Dep. Ex. 30; TWH/NWH 0866-0868), where page 0867's top right corner shows Roan Allen as an ancestor of Hals Happy Spirit, and bears the designation "F-38."; <u>see also</u> TWH/NWH 4953-4961 (1938 Stud Book listing 63 Foundation horses, and explaining their significance at TWH/NWH 4953).
[53] Ex. 2 is a summary of seven horses that applied with NWHA, comparing the colors and markings listed on the NWHA application, with those listed on the NWHA Registry Certificate (in which NWHA ignored the colors or markings on the application, and instead copied verbatim from the TWHBEA Registry Certificate) [taken from the 164 NWHA applications and Registry Certificates that NWHA produced in response to TWHBEA's Second Set of

Majority of NWHA Directors were previously TWHBEA Directors

Twelve of 16 of NWHA's founding directors were also sitting directors of TWHBEA.[54] And approximately all NWHA board members are current or former members of TWHBEA.[55]

Unlike NWHA, TWHBEA Registration Certificates Offer Quality Assurance in the Marketplace

TWHBEA Registration Certificates offer an assurance of quality to horse owners in the marketplace. For example, NWHA only requires DNA testing for those horses applying for NWHA-registration that have never been registered with TWHBEA or the Canadian registry.[56] And at the time of NWHA's 30(b)(6) deposition, there were no horses registered with NWHA that were not also registered with TWHBEA or the Canadian registry.[57] Further, as Ken DeHaven (who was president of NWHA's board at the time of his deposition) explained, many NWHA members continued to register their horses with TWHBEA even after NWHA launched its own registry.[58]

NWHA's Registry, on the other hand, offers no assurance of quality in the marketplace. When asked if anyone at NWHA had confirmed the lineage of the 1500 horses uploaded from the canned software that NWHA purchased, Debbie Nuding (NWHA's database administrator), answered "No."[59] In fact, NWHA received at least several requests from owners to remove their horses from the NWHA Registry. Horse-owner Kristin Chambers emailed Nuding: "I want my

---

Req. for Prod, No. 15 [NWHA 0353-1382, *the only ones of which are reproduced here being those attached to Ex. 2*.]

[54] TWH/NWH 4100-01 (TWHBEA Executive Committee minutes from Oct. 26, 1998).

[55] Bell dep. at 173.

[56] Bell dep. at 179; Nuding dep. at 30.

[57] Bell dep. at 75-76.

[58] See deposition of Ken DeHaven at 10 (explaining that he continued to register his horses with TWHBEA even after NWHA was formed because "we have a lot of people out there who if you want to sell horses, you know, they think they have to be registered with [TWHBEA]"). Ken DeHaven was president of the NWHA board at the time of his deposition, per DeHaven dep. at 6.

[59] Nuding dep. at 24.

gelding, Weapon's Golden Delight, completely removed from the [NWHA] registry."[60]  Horse-

owner Ronnie Blakely emailed NWHA's executive director Don Bell:

> Mr. Bell, I just realized that my horse, What's Up Tiger Lily, is listed in your
> NWHA registries on-line database.  My horse is not registered in your registry
> and I take offense in your web registry stating so, as if she is a grade mare.  How
> you obtained my horse's TWHBEA-registered name and entered it in your
> registry database is beyond me.  You have no right to my horse's information or
> her registered TWHBEA name.  I demand you remove my horse from your data
> base and reply to this email stating when it is done.[61]

Still a third horse-owner, David Wenger, emailed Nuding to ask how NWHA obtained his

horses' names and who gave NWHA permission to place them in the NWHA Registry.  Wenger

stated: "I want them out of the data base, First Classic, High Dollar Deduction, Revelation Spirit,

Power's Stormy Weather.  I will check later to see if any of my TENNESSEE WALKING

HORSES are still included in your mutt registry."[62]

Likelihood of Confusion

As the president of TWHBEA's Executive Committee, Jerrold Pedigo, explained in his

deposition, NWHA's use of the service-mark "TWHBEA" is likely to cause confusion among

the public.  "[I]t gives the reader the perception that this [NWHA] is the breed registry when, in

fact, [NWHA is] copying the breed registry."[63]  Noting that the pre-December 26, 2005 NWHA

Website referred at least four times to TWHBEA,[64] Mr. Pedigo elaborated: "[I]t sends mixed

messages to the public as to the correct breed registry, that it is a true Tennessee Walking

Horse."[65]

---

[60] Nuding dep. at 61-62.
[61] Nuding dep. at 64.
[62] TWH/NWH 0001.
[63] Pedigo dep. at 26-27.
[64] Pedigo dep. at 33.
[65] Pedigo dep. at 31.

<u>No Laches</u>

TWHBEA first learned of NWHA's infringing conduct in the spring of 2005[66].  After careful investigation, it filed the present suit on December 2, 2005.

## IV.  SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c); <u>Meyers v. Columbia/HCA Healthcare Corp.</u>, 341 F.3d 461, 466 (6th Cir. 2003).  In deciding a motion for summary judgment, the Court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party.  <u>Id.</u>; <u>Hopson v. DaimlerChrysler Corp.</u>, 306 F.3d 427, 432 (6th Cir. 2002).

To prevail, the non-movant must produce specific evidence that demonstrates there is a genuine issue of material fact for trial.  <u>Meyers</u>, 341 F.3d at 466.  A mere scintilla of evidence is insufficient; there must be evidence on which the trier of fact could reasonably find for the non-movant.  <u>Id.</u>  The non-moving party may not rest on mere allegations but must set forth specific facts showing that there is a genuine issue for trial.  <u>Hopson</u>, 306 F.3d at 432.

## V.  LEGAL ARGUMENT

A.     <u>Trademark Infringement & Unfair Competition</u>

1.     Trademark Infringement in Violation of 15 U.S.C. § 1114(1)

There is no doubt that NWHA has infringed on TWHBEA's trademarks.  It is undisputed that TWHBEA was the first organization or person to use the TWHBEA Design Marks, and that TWHBEA has used them continuously.  It is also undisputed that for 17 months, the NWHA

---

[66] Deposition of Jerrold Pedigo in his non-30(b)(6) capacity at 10-13; TWHBEA's Ans. to First Set of Interrog. No. 5 (noting date as between March and May 2005).

Website openly encouraged the public to submit TWHBEA Registry Certificates when applying for NWHA Registry Certificates. Only after TWHBEA filed the present suit did NWHA remove references to TWHBEA from the NWHA Website.

Under 15 U.S.C. § 1114, also known as the Lanham Act, the focus of liability is "whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center, 109 F.3d 275, 280 (6th Cir. 1997) (reversing district court's denial of plaintiff's motion for partial summary judgment, and grant of defendant's summary judgment motion). The Sixth Circuit has identified eight factors to examine and weigh when determining whether a likelihood of confusion exists: "(1) strength of the senior mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines." Id. Each case is fact-specific; no one factor necessarily dominates the others; and not every factor will be relevant to all cases. See id. "The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." Id. This "ultimate determination of 'likelihood of confusion' is a legal conclusion . . . ." Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc., 670 F.2d 642, 651 (6th Cir. 1982).

Here, analysis of the eight factors weighs in favor of finding likelihood of confusion. First, TWHBEA's marks, which are senior, are strong. An "incontestable" mark – one that is not successfully challenged within five years – "is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark." Daddy's Junky Music, 109 F.3d at 282. As noted above, since June 1974, TWHBEA has continuously used the service-mark "TENNESSEE

WALKING HORSE BREEDERS' AND EXHIBITORS' ASSOCIATION" in interstate commerce; and since as early as May 30, 1992, the service-marks (a) "TWHBEA," and (b) the "TWHBEA Design Mark" (all three collectively the "TWHBEA Marks"). The U.S. Patent & Trademark Office issued registration of the "TWHBEA Design Mark" on January 31, 1995, and such mark has been incontestable ever since January 31, 2000. Thus, TWHBEA satisfies the first factor.

TWHBEA also satisfies the second factor, relatedness of the goods. Here, the goods and services are virtually identical. For over 70 years, TWHBEA has recorded the lineage of Tennessee Walking Horses and issued certificates of ownership and pedigree. For two years now, since July 2004, NWHA has done the same.

In analyzing the third factor, there is not just "similarity of the marks"; the marks are identical. NWHA referred to TWHBEA at least five times on the pre-December 26, 2005 NWHA Website, and invited the public to submit TWHBEA Registry Certificates.[67] As Jerrold Pedigo, the president of TWHBEA's Executive Committee, noted, NWHA's use of the THWBEA Marks "sends mixed messages to the public."[68] This third factor "is a factor of considerable weight." Id. at 283.

Although TWHBEA does not have evidence of actual confusion that NWHA and TWHBEA are the same organizations, there is direct evidence of confusion over possible affiliation or approval by TWHBEA regarding the NWHA Registry. At least three consumers, Kristin Chambers, Ronnie Blakely and David Wenger, were confused as to how their horses appeared on the NWHA Website without their permission. Blakely questioned: "How you obtained my horse's TWHBEA-registered name and entered it in your [NWHA] registry

---

[67] Ex. E to Complaint (Doc. 1-6) (Printout from NWHA Website, dated 11/29/05).
[68] Pedigo dep. at 31.

database is beyond me."[69]  If Blakely believed that TWHBEA had even tacitly approved the listing of his horse in the NWHA Registry, such confusion could very likely damage TWHBEA. Regardless of whether TWHBEA has direct evidence regarding the fourth factor, "a lack of such evidence is rarely significant."  Id. at 284.

In analyzing the fifth factor regarding the marketing channels, NWHA is reaching out to the same consumers as TWHBEA: according to one of TWHBEA's experts, Glenn Perdue, 158 (or 96%) of the 164 applications that owners submitted to NWHA attached a copy of their horse's TWHBEA Registry Certificate.[70]

Regarding the sixth factor, consumers of both NWHA and TWHBEA Registry goods and services are most likely sophisticated purchasers.  "The ultimate significance of a given degree of care, however, often will depend upon its relationship with the other seven factors."  Id. at 285.  Here, therefore, the sixth factor is not significant.

In examining the seventh factor – intent, it is clear that NWHA intended to benefit from the TWHBEA Marks when it referred to them for 17 months on the NWHA Website, and invited the public to submit their TWHBEA certificates when applying with NWHA.  In fact, the NWHA Website stated[71] "the public MUST submit registry certificates from either TWHBEA or the Canadian registry" (emphasis in the original).  Twelve of 16 of NWHA's founding directors were also sitting directors of TWHBEA.[72]  Almost all NWHA board members are current or former members of TWHBEA.[73]  In light of this overlap of membership between the parties' leaders, and in light of the fact that NWHA members (including Ken DeHaven, who was president of NWHA's board when he was deposed in this case) continue to apply for registration

---

[69] Nuding dep. at 64.
[70] Perdue decl. ¶ 4.
[71] Ex. E to Complaint (Doc. 1-6) (Printout from NWHA Website, dated 11/29/05); Nuding dep. at 42.
[72] TWH/NWH 4100-01 (TWHBEA Executive Committee minutes from Oct. 26, 1998).
[73] Bell dep. at 173.

with TWHBEA despite the alternative of registering with NHWA, NWHA cannot legitimately claim lack of intent – especially when NWHA used the TWHBEA Marks verbatim. Further, considering that TWHBEA enjoys a domestic market share of at least 98% of registered Tennessee Walking Horses,[74] there is at least some circumstantial evidence that NWHA was aware of the TWHBEA Marks, which can support an inference of intentional copying. Id. at 287.

Finally, in examining the eighth factor – likelihood that product lines will expand – there is "a strong possibility" that either TWHBEA or NWHA will continue to expand its reach "to compete with the other or be marketed to the same consumers," Id. at 287, as both parties continue to reach out to Tennessee Walking Horse owners. This weighs in favor of finding that the present use by NWHA is infringing.

> 2. Unfair Competition, in Violation of 15 U.S.C. § 1125(a), Federal Common Law, and Tenn. Code Ann. § 47-18-104

False Designation under 15 U.S.C. § 1125(a) (otherwise referred to as Section 43(a) of the Lanham Act); Tennessee's equivalent – Tenn. Code Ann. § 47-18-104; and federal common law all mirror the above analysis regarding the "federal claim of trademark infringement by also requiring proof of a likelihood of confusion." See Daddy's Junky Music, 109 F.3d at 288; Wynn Oil Co. v. American Way Serv. Corp., 943 F.2d 595, 604 (6th Cir. 1991) (affirming finding of both trademark infringement claim and, therefore, also unfair competition claim). "[F]alse representations of the source of a product constitute the common-law tort of 'unfair competition,; or as it is otherwise known, 'passing off.'" Frisch's Restaurants, 670 F.2d at 647. Similar to a claim of trademark infringement under 15 U.S.C. § 1114(1), the essence of unfair competition claims is "likelihood of confusion," and the analysis is the same. Wynn Oil, 943 F.2d at 604.

---

[74] Perdue decl. at ¶ 9.

Section 43(a) of the Lanham Act imposes liability on:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which – (A) is *likely to cause confusion*, or to cause mistake, or to deceive . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A) (emphasis added).  "[O]nly a likelihood of confusion or deception need be shown in order to obtain equitable relief. . . . [and such] need not arise from intentional conduct; . . . a mere showing that advertisements tend to create a false impression is sufficient to warrant injunctive relief."  Frisch's Restaurants, 670 F.2d at 647.  "All that is required is that the representation or descriptions either be 'false' or such as is 'tending falsely to describe or represent the goods or services in question.'"  Id.  "The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way."  Autozone, Inc. v. Tandy Corp., 373 F.3d 786, 793 (6th Cir. 2004) (affirming summary judgment for defendant where majority of the eight factors weighed in defendant's favor).

TWHBEA has established, above, the likelihood of confusion created by NWHA.  For the 17 months in which NWHA explicitly invited owners to submit TWHBEA Registry Certificates along with their NWHA applications, NWHA left the impression that the two organizations were affiliated to some unknown extent.  The NWHA Website has actually confused at least three consumers as to this affiliation, one of whom specifically asked how NWHA obtained information regarding his TWHBEA-registered horse.  Unlike the plaintiff in Autozone which demonstrated only three factors that weighed in its favor (strong mark, common marketing channels and low degree of purchaser care), 373 F.3d at 800-01, TWHBEA has presented evidence of seven factors in its favor: that the marks are identical, evidence of some

actual confusion, evidence of NWHA's intent in using the TWHBEA Marks, evidence of

NWHA's present expansion into TWHBEA's same product line, evidence of virtually identical

products and services being offered, evidence that TWHBEA's senior marks are strong in light

of their incontestability, and evidence of the same marketing channels used. Only one of the

eight factors – likely degree of purchaser care – weighs in favor of NWHA and, as discussed

above, this factor bears little impact when compared with the other seven. See e.g., Daddy's

Junky Music, 109 F.3d at 282.

 The same analysis that applies to the Lanham Act, above, applies to TWHBEA's claims

of violations of the Tennessee Consumer Protection Act. McDonald's Corp. v. Shop at Home,

Inc., 82 F. Supp. 2d 801, 816 (M.D. 2000). Here, TWHBEA has alleged violations of the

Consumer Protection Act that most closely resemble subsections 1, 2, 3, 5 and 21 of Tenn. Code

Ann. § 47-18-104(b). Under Tennessee law, the ultimate question again is whether the

defendant has created a likelihood of confusion among consumers, which TWHBEA has

addressed above. See id. (quoted in Microsoft Corp. v. Sellers, 411 F. Supp. 2d 913, 920 (E.D.

Tenn. 2006)).

   3. Relief Sought for Trademark Infringement, Unfair Competition and
     Violation of Tenn. Code Ann. § 47-18-104

 For the reasons above, summary judgment should be granted to TWHBEA on its claims

of trademark infringement, unfair competition and violation of Tenn. Code Ann. § 47-18-104,

and NWHA should be permanently enjoined from using any simulation, reproduction,

counterfeit, copy or colorable imitation of the TWHBEA Marks in connection with the

promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or

distribution of any product or service.

B.    Copyright Infringement, in Violation of 17 U.S.C. § 101 et seq.

In any copyright infringement case, courts must ask two questions: first, is the material subject to copyright protection and, second, did defendant infringe on it?  Kohus v. Mariol, 328 F.3d 848, 853 (6th Cir. 2002) (vacating summary judgment for defendant on copyright infringement claim).  Here, there is no question that NWHA has copied vast swaths of data from TWHBEA Registry Certificates.[75]  The key question, instead, is whether TWHBEA's Registry is protected by copyright.

1.    TWHBEA's Registry Qualifies for Copyright Protection

The copyright registration certificates that TWHBEA has produced[76] are *prima facie* evidence of TWHBEA's ownership of valid copyrights in the TWHBEA Registry.  See 17 U.S.C. § 410(c); Microsoft, 411 F. Supp. 2d at 918.  And NWHA's knowledge or intent is irrelevant to its liability for copyright infringement.  See 17 U.S.C. § 501(a); Microsoft, 411 F. Supp. 2d at 918.  Since the TWHBEA Registry is a compilation, however, further analysis is needed.

As the Supreme Court noted in Feist Publications, Inc. v. Rural Tel. Service Co, it is "well established" that "facts are not copyrightable," but that "compilations of facts generally are."  499 U.S. 340, 344 (1991) (holding no infringement where state regulation required defendant public utility to publish names and telephone numbers of subscribers, and where such information was arranged merely alphabetically).  As a compilation, TWHBEA's database is governed by Section 101 of the Copyright Act of 1976, which defines a copyrightable compilation as "a work formed by the collection and assembling of preexisting materials or of

---

[75] See Discussion above; Perdue Decl. at ¶¶ 4-5, and Ex. B attached thereto; Ex. 2 (chart of 7 horses for whom NWHA ignored the applicant's designated colors and markings and instead copied the TWHBEA Registry Certificate verbatim); see also NWHA 0353-1382, not reproduced here, but produced by NWHA: 164 NWHA Registry Certificates, 158 of which attached TWHBEA Certificates, from which NWHA copied the pedigree.
[76] Stmt. of Undisputed Mat. Facts 8-10.

data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101.

Courts examining this language have found it suggests three requirements for a compilation to qualify for copyright protection: "(1) the collection and assembly of preexisting data; (2) the selection, coordination, or arrangement of that data; and (3) a resulting work that is original, by virtue of the selection, coordination, or arrangement of the data contained in the work." See Feist, 499 U.S. at 357. "There is thus more to a copyrightable compilation than the simple collection of uncopyrightable facts. Such a compilation must "feature [ ] an original selection or arrangement of [those] facts." Key Publications, Inc. v. Chinatown Today Publ'g Enter., Inc., 945 F.2d 509, 512 (2d Cir. 1991) (post-Feist; holding that the telephone directory was protected by copyright, but that defendant had not infringed). The "requirement of originality . . . is not particularly rigorous. Simply stated, original means not copied, and exhibiting a minimal amount of creativity. . . . In practice, the requirement of originality has become 'little more than a prohibition of actual copying.'" 945 F.2d at 512-13; see Ross, Brovins & Oehmke, P.C. v. Lexis Nexis Group, 463 F.3d 478, 483 n.1 (6th Cir. 2006) (holding that compilation of legal forms were sufficiently creative to warrant copyright protection, but ultimately finding defendant's selection not similar enough to constitute infringement, and discussing Key favorably within the opinion).

The Second Circuit explained that every compilation, by its definition, satisfies the first prong of the test, as it is a collection of data. The true test, instead, is whether the "selection, coordination, or arrangement . . . is sufficiently original or creative . . . ." Id. at 513.

"Selection implies the exercise of judgment in choosing which facts from a given body of data to include in a compilation." Id. In Key, where the court concluded that the selection was

original, Id. at 513, the plaintiff published an annual classified business directory for New York City's Chinese-American community, assembled through its president's collection of business cards from the various businesses in Chinese-American community, and by borrowing from another compilation (a restaurant directory). Id. at 511. Key Directory "was sorted by type of business," with each listing place in "one of over 260 different categories," and "each of the approximately 9000 listings consist[ing] of an English and Chinese name, an address, and a telephone number." Id.

"Arrangement refers to the ordering or grouping of data into lists or categories that go beyond the mere technical grouping of data as such, for example, alphabetical, chronological, or sequential listings of data." Id. at 513. While the court found that Key Directory contained a format "common to most classified directories," it nevertheless held that the arrangement was original, as it included some categories "of particular interest to the Chine-American community and not common to yellow pages." Id. at 513-14. Importantly, the court stated: "The arrangement is in no sense mechanical, but involved creativity on the part of Ms. Wang in deciding which categories to include and under what name." Id. at 514.

Like Key, TWHBEA's selection and arrangement are original. Although the TWHBEA Registry Certificate employs a family tree diagram, and while such diagram may appear generic on a quick glance, TWHBEA exercised creativity in deciding what to include: from the choice about which horses to include (and their ancestors), to the designation for foundation horses, and from specific colors to specific markings, which have evolved over time.

As discussed above, TWHBEA began its Registry in 1935, and has maintained it continuously since that time. A TWHBEA Registry Certificate shows the world that a registered horse is pure-bred and comes from a protected lineage that can be traced to 1935. At the time

TWHBEA began, its leaders picked what they determined to be the best horses to serve as the foundation stock. In all, they chose 63 foundation horses, which, over time, bore the notation "F-" followed by the corresponding horse number on TWHBEA Registry Certificates.[77] TWHBEA chose certain colors and markings found in the best of the Breed, and as evidence that its selection is original, TWHBEA fine-tuned its color and markings guide over the years.

The very act of beginning to compile the pedigree and lineage of the Tennessee Walking Horse in 1935, and then continuing to do so is, by itself, the heart of TWHBEA's original selection. Unlike the plaintiff in <u>Feist</u>, TWHBEA is not a public utility and it is not required by the state to record or publish horse pedigrees. Without TWHBEA's 70 year, $63.5 million investment, there would be no record of the pedigree of the Tennessee Walking Horse. <u>Feist</u> is further distinguishable from this case in that the <u>Feist</u> plaintiff had no choice in determining which entries to include in its white pages – it was required to include all subscribers for telephone service, whose names were listed alphabetically, along with their addresses and telephone numbers. 499 U.S. at 342. Unlike <u>Feist</u>, not every horse that applies to the TWHBEA Registry is accepted; only those that demonstrate they are the offspring of a pure-bred TWHBEA-registered Tennessee Walking Horse are chosen.[78]

The assurance of quality that the TWHBEA Registry offers is so valuable to horse owners that even NWHA's president continued to register his horses with TWHBEA after NWHA launched its own registry. The NWHA Registry offers no similar quality assurance. Instead, it imported 1500 horses and their ancestors from canned software, the accuracy of which no one from NWHA confirmed, according to Debbie Nuding. NWHA performs none of its own blood work if a horse is registered with TWHBEA or the Canadian registry. And at the time of

---

[77] Brandon Decl. at ¶ 6; <u>see also</u> TWH/NWH 4953-4961 (1938 Stud Book listing 63 Foundation horses, and explaining their significance at TWH/NWH 4953); Nuding dep. 50.
[78] Brandon decl. ¶ 5.

NWHA's 30(b)(6) deposition, there were no horses registered with NWHA that were not also registered with TWHBEA or the Canadian registry.

The present case is also similar to Montgomery Co. Assoc. of Realtors, Inc. v. Realty Photo Master Corp., 878 F. Supp. 804 (D. Md. 1995). There the defendant gained access to the plaintiff's MLS database and used its data to offer a photographic service to the plaintiff's members. Id. at 808-09. Defendant argued that "MLS compilation itself [could not] receive copyright protection". Id. at 809. The court disagreed, holding that

> [u]nlike a telephone directory, … the arrangement of the information in [the plaintiff's] MLS database, "possesse[d] at least some minimal degree of creativity." Specifically, many … reports contain[ed] marketing puffery that [could not] be characterized as factual (e.g., "elegant updated home, close to DC line, gorgeous private back yard, lovely sunroom off LR"). Also, [the plaintiff] has employed a unique and elaborate system of abbreviations in organizing its database. That each MLS property report contain[ed] some purely factual information relating to the home (e.g., address, style, age, floor plan, asking price) [did] not negate the original presentation and arrangement of the information in the database.

Id. at 810. Like the plaintiff in Montgomery Co., TWHBEA Registry Certificates contain unique colors and combinations such as "Smokey Cream," "Champagne," "Gold Cream Champagne," "Sorrel," and "Tobiano." A horse may be born a certain color, but through its creativity TWHBEA selected the various names to call the color.

One need only examine two examples to see that NWHA copied verbatim from TWHBEA Registry Certificates specific descriptions for horse markings. As a first example, After Glo's NWHA application listed these markings: Blaze lower lip, sock left hind leg, fetlock right hind leg."[79] But After Glo's TWHBEA Registry Certificate[80] stated: "Near hind sock, off hind fetlock, lower lip, blaze" – which is exactly what NWHA copied onto the NWHA Registry

---

[79] NWHA 0354-55.
[80] NWHA 0356.

Certificate[81] that it issued for that horse. A second example of NWHA copying unique TWHBEA identifiers is Son's Suede Karma, whose NWHA application listed these markings: "Bald face, sock, mix flax."[82] Its TWHBEA Registry Certificate,[83] however, listed these markings: "Four stockings, bald, flax mane, white tail" – which is exactly what appeared on the NWHA Registry Certificate[84] when it was eventually issued. See also Ex. 2 (chart summarizing seven examples of NWHA copying colors and/or markings from the TWHBEA Registry Certificate rather than from the application submitted to NWHA).

Further evidence that NWHA has copied TWHBEA's unique abbreviations is found on the NWHA Website, when searching the pedigree of Hals Happy Spirit.[85] As explained above, TWHBEA uses the abbreviation "F-" to identify those horses that comprise the original foundation stock of TWHBEA, from which all other horses have descended. The NWHA Registry page for Hals Happy Spirit shows that he is a descendant of Roan Allen, whose name bears the abbreviation "F-38" next to it.[86] As in Montgomery County, TWHBEA created these identifiers and abbreviations, and they are unique to TWHBEA. See also CDN Inc. v. Kapes, 197 F.3d 1256 (9th Cir. 1999) (affirming summary judgment for plaintiff on copyright infringement claim where defendant copied coin prices listed in plaintiff's newsletter).

> 2.  NWHA Has Infringed on TWHBEA's Copyrights

In interpreting Feist, the Second Circuit has not read it broadly to permit a finding of infringement only when a subsequent compiler produces an exact replica of a copyrighted

---

[81] NWHA 0353.
[82] NWHA 1206-07.
[83] NWHA 1208.
[84] NWHA 1204.
[85] Pedigree of Hals Happy Spirit NWHA Tracking Registry # 19890003, printed off the NWHA Registry on May 16, 2006 (Dep. Ex. 30; TWH/NWH 0868-0876).
[86] Compare TWHBEA Registry Certificate for Hals Happy Spirit (TWH/NWH 4953-4963) with TWH/NWH 0866-0868, where page 0867's top right corner shows Roan Allen as an ancestor of Hals Happy Spirit, and bears the designation "F-38."

compilation.  See id. at 514.  As the court noted, "[s]uch a reading of Feist would allow

subsequent compilers to avoid infringement suits simply by adding a  single fact to a verbatim

copy of the copyrighted compilation, or omitting . . . a single fact."  Id.  "Such a result would

render the copyright of a compilation meaningless.  While . . . the 'copyright in a factual

compilation is thin,' . . . we do not believe it is anorexic."  Id. (citing Feist).  Instead, what must

be shown is merely "substantial similarity" between the two users as to the elements that make

the copyright owner's work "original."  Id.

Regarding the second element – whether a compilation has been infringed – Key is

instructive to the present case, but distinguishable from the present case in that it held there was

no infringement.  It is distinguishable in that the defendant copied only 28 of the 260 categories

listed in the plaintiff's directory, and only 1500 of the plaintiff's 9000 actual listings.  Id. at 515.

(The listings copied were chosen from random sections, and no category contained more than a

few duplicated entries.  Id.)  But it is instructive in that the Key court determined "the

significance of the copied material to the plaintiff's work, rather than its significance to the

defendant's work, is important in evaluating substantial similarity."  Ross, Brovins & Oehmke,

P.C. v. Lexis Nexis Group, 463 F.3d 478, 483 n.2 (6th Cir. 2006).

Here, like in Feist, there is no dispute that NWHA has copied whole cloth from the

TWHBEA Registry.  NWHA's act of copying the TWHBEA Registry infringes on the very heart

of TWHBEA's original selection.  NWHA has copied not only the pedigrees included on

TWHBEA Registry Certificates, but also specific notations and abbreviations that TWHBEA

created.  For example, NWHA invited every potential applicant to submit a TWHBEA Registry

Certificate along with the application.  Over 96% of those who applied for a NWHA Registry

Certificate contemporaneously submitted a TWHBEA Registry Certificate with their

application.[87]   In at least seven of those cases, NWHA ignored the colors or markings noted on the NWHA application, instead copying verbatim the colors and markings noted on the attached TWHBEA Registry Certificate.[88]   A second example is the fact that NWHA has copied TWHBEA's designation given to its foundation stock, such as "F-38."   Debbie Nuding, NWHA's database administrator explained she understood that abbreviation signified that a horse was a foundation horse for TWHBEA.[89]   Such knowledge did not stop NWHA from copying this unique identifier contained in the TWHBEA Registry.  In fact, not even this lawsuit has stopped NWHA from continuing to include the "F-" identifier on the NWHA Website, as noted by Ex. 3 (Nov. 15, 2006 Printout from NWHA Website of Pedigree of Ebony Masterpiece, copying the "F-" identifier four times on a single pedigree).

> 3.   Relief Sought for Copyright Infringement

For these reasons, summary judgment should be granted to TWHBEA on its copyright claim, and NWHA should be permanently enjoined from copying or making any unauthorized use of the TWHBEA Registry or any other works of TWHBEA subject to copyright protection, in any manner, and from publishing, distributing, selling, marketing, producing or otherwise disposing of any copies of the TWHBEA Registry or any other works of TWHBEA subject to copyright protection.

C.   Three of NWHA's Affirmative Defenses Can Withstand Summary Judgment

Defendant asserts that TWHBEA's claims are barred by statute of limitations, laches and estoppel.[90]

---

[87] Perdue decl. at ¶ 4.
[88] Ex. 2 (chart of 7 horses for whom NWHA ignored the applicant's designated colors and markings and instead copied the TWHBEA Registry Certificate verbatim).
[89] Nuding dep. at 50.
[90] Defendant also asserts other affirmative defenses.  See Answer, § VI, ¶¶ 1-5.

First, regarding the statute of limitations defense, TWHBEA filed the instant complaint on December 2, 2005. TWHBEA first learned that NWHA may have engaged in infringement on TWHBEA's copyrights and trademark rights between March and May, 2005.[91] The Copyright Act provides that an action under its provisions can be maintained if it is commenced "within three years after the claim accrued." 17 U.S.C. § 507(b). The statute of limitations with respect to the claims of unfair competition brought under 15 U.S.C. § 1125(a) and under the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104, is one year. Tenn. Code Ann. § 47-18-110; Johnny's Fine Foods, Inc. v. Johnny's, Inc., 286 F. Supp. 2d 876, 881 (M.D. Tenn. 2003). "The analogous Tennessee limitations period for trademark violations under 15 U.S.C. §§ 1114 and 1125(c) is the three year period provided for actions for tortious injury to property." Johnny's Fine Foods, Inc., 286 F. Supp. 2d at 881. Therefore, NWHA's claim that TWHBEA's action is barred by the applicable statute of limitations fails, as a matter of law.

Second, laches is the "negligent and unintentional failure to protect one's rights." Elvis Presley Enter., Inc. v. Elvisly Yours, Inc., 936 F.2d 889, 894 (6th Cir. 1991). "In evaluating whether a party has been diligent in protecting its trademark, [the court must] look to the state-law statute of limitations for injury to personal property." Id. The courts of the Sixth Circuit "hold faithfully to the principle that 'a suit will not be barred by laches before the analogous statute of limitations has run.'" Johnny's Fine Foods, Inc., 286 F. Supp. 2d at 881 (citing Tandy Corp. v. Malone & Hyde, Inc., 769 F.2d 362, 365-66 (6th Cir. 1985)); see also Elvis Presley Enter., 936 F.2d at 894 ("In this Circuit, there is a strong presumption that a plaintiff's delay in asserting its rights is reasonable as long as an analogous state statute of limitations has not elapsed."). Defendant's assertion of laches is, therefore, without merit, as a matter of law.

---

[91] Stmt. of Undisp. Mat. Fact 36.

Third, estoppel "is not favored" under Tennessee law, "and it is the defendant who has the burden of proving every element of an estoppel."

> As a basis for equitable estoppel, the party invoking the estoppel must have acted in reliance on the actions of the other party, with the result that the party seeking to invoke estoppel be injured by his own conduct without the estoppel. Finally, a party claiming the benefit of an equitable estoppel must have proceeded with the utmost good faith.

Elvis Presley Enter., 936 F.2d at 895 (citations omitted).

Here, the record clearly demonstrates that NWHA cannot establish the elements of estoppel. NWHA was fully aware of TWHBEA's trademarks, and yet, as established above, NWHA intended to benefit from associating itself with the TWHBEA Marks when it referred to them for 17 months on the NWHA Website and invited the public to submit TWHBEA Registry Certificates. 12 of 16 of NWHA's founding directors were also sitting directors of TWHBEA. And in light of TWHBEA's domestic market share of at least 98% of Tennessee Walking Horses, it would be disingenuous for NWHA to assert it was unaware of TWHBEA's trademarks. In light of NWHA's unclean hands and knowledge of TWHBEA's rights, it cannot establish that it relied on TWHBEA or that it acted in good faith. Accordingly, TWHBEA is entitled to summary judgment on NWHA's affirmative defense of estoppel.

## VI. CONCLUSION

For all of the above reasons, TWHBEA respectfully submits that it is entitled to partial summary judgment on its claims of Trademark Infringement, Unfair Competition and Copyright Infringement. It also seeks summary judgment on Defendant's affirmative defenses of statute of limitations, laches and estoppel.

Respectfully submitted,

**BONE MCALLESTER NORTON, PLLC**

By: _____

Stephen J. Zralek (B.P.R. No. 18971)
Natalya L. Rose (B.P.R. No. 21701)
511 Union Street, Suite 1600
Nashville, Tennessee 37219
Telephone: (615) 238-6300
Facsimile: (615) 238-6301
szralek@bonelaw.com
nrose@bonelaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that a true and exact copy of the foregoing has been served, via ECF, on this 15th day of November, 2006, on:

Bruce H. Phillips, Esq.
11 Music Circle South, Suite 202
Nashville, TN 37203

and

Thomas C. Corts, Esq.
Deron Brown, Esq.
200 Fourth Avenue, North, Third Floor
Nashville, TN 37219

*Counsel for Defendant*

_____