IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

TENNESSEE WALKING HORSE       )
BREEDERS' AND EXHIBITORS'      )
ASSOCIATION                    )
                               )
v.                             )        No. 1:05-0088
                               )        JUDGE CAMPBELL
NATIONAL WALKING HORSE         )
ASSOCIATION                    )


MEMORANDUM

I. Introduction

Plaintiff Tennessee Walking Horse Breeders' and Exhibitors' Association ("TWHBEA")

filed this action against Defendant National Walking Horse Association ("NWHA"), alleging

copyright infringement in violation of 17 U.S.C. §101, et seq. (the "Copyright Act"), trademark

infringement in violation of §1114(1) of the Lanham Act, 15 U.S.C §1051, et seq. (the "Lanham

Act"), unfair competition in violation of §1125(a) of the Lanham Act, trademark dilution in

violation of §1125(c) of the Lanham Act, unfair competition in violation of §47-18-104 of the

Tennessee Consumer Protection Act, Tenn. Code Ann. §47-18-101, et seq. ("TCPA"), and the

common law torts of unfair competition and intentional interference with business relations.

(Complaint, Docket No. 1). The Court has granted summary judgment to the Plaintiff on the

copyright infringement claim, and denied summary judgment on all other claims. (Docket Nos.

51, 52).

The Court held a bench trial in this case commencing on November 6, 2007 on the

remaining claims and issues, including the appropriate remedy for copyright infringement. After

the trial, the Court directed the parties to file proposed findings and conclusions. The parties

have now filed their proposals (Docket Nos. 125, 126).

This Memorandum shall constitute the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52.

## II. Findings Of Fact And Conclusions Of Law

A. Factual findings

The parties filed extensive stipulations of fact upon which they relied at trial (Docket Nos. 64, 117). The following findings of fact are based on those stipulations and other evidence adduced at trial.

In 1935, TWHBEA created and established a registry (the "TWHBEA Registry") to record the pedigrees of Tennessee Walking Horses. (Pre-Trial Fact And Exhibit Stipulations Of Plaintiff And Defendant, at ¶ 1 (Docket No. 64)(hereinafter "First Stipulations")). The purpose of the organization has been and continues to be to "collect, record and preserve the pedigrees of the strain of horses known as the Tennessee Walking Horse wherever located." (Id., at ¶ 2). TWHBEA maintains in its possession the pedigree of every horse registered with it since 1935.

In 1938, TWHBEA, or its predecessor, published a 239 page book entitled The Register of the Tennessee Walking Horse Breeders' Association of America (the "1938 Registry"). (Id., at ¶ 3). The 1938 Registry included a copyright notice showing 1938 as the date of first publication and TWHBEA as the copyright claimant. Plaintiff indicated at trial that it no longer claims copyright protection for the Registry as it existed prior to 1964.

In order to obtain a certificate from TWHBEA, a horse owner must demonstrate, among other things, that the parents of the horse are both registered with TWHBEA. In that respect, some of the witnesses referred to the Registry as being a "closed" registry. Every horse that is

2

registered with TWHBEA is issued a registration certificate ("Registry Certificate") that is kept in TWHBEA's files. As of November 13, 2006, TWHBEA had approximately 430,000 horses in its Registry, giving it a market share of 98% of registered Tennessee Walking Horses. (Id., at ¶ 4). The Registry consisted of 479,466 horses as of November 2, 2007. (Plaintiff's Exhibit 3A, Tab 42).

TWHBEA has registered its copyright in the present TWHBEA Registry with the United States Copyright Office. (First Stipulations, at ¶ 6). TWHBEA's copyright notice has appeared on its applications for registration continuously since 1979, in its rule books continuously since before 1994, and on its Registry Certificates. (Id., at ¶¶ 7-8).

In addition, since June, 1974, TWHBEA has continuously and exclusively used the service-mark TENNESSEE WALKING HORSE BREEDERS' AND EXHIBITORS' ASSOCIATION in interstate commerce in connection with maintenance of the TWHBEA Registry, sporting events, and competitions for the Tennessee Walking Horse, and informational services, printed materials and publications related to the Tennessee Walking Horse. (Id., at ¶ 9).

Since May 30, 1992, TWHBEA has continuously and exclusively used the service-mark TWHBEA and the service-mark TWHBEA and Design (horse's head in a circle)(the "Design Mark") in interstate commerce in connection with maintenance of the TWHBEA Registry, sporting events and competitions for the Tennessee Walking Horse, and informational services, printed materials and publications related to the Tennessee Walking Horse. (Id., at ¶¶ 10-11).

Since July, 2002, TWHBEA has continuously and exclusively used the service-marks (a) TENNESSEE WALKING HORSE BREEDERS' AND EXHIBITORS' ASSOCIATION, (b)

3

TWHBEA, and (c) the TWHBEA Design Mark (the "TWHBEA Marks") in interstate commerce in connection with on-line informational services, computerized communications services and on-line retail store services related to the Tennessee Walking Horse. (Id., at ¶ 12). The United States Patent and Trademark Office issued registration for the TWHBEA Design Mark, in connection with the maintenance of the TWHBEA Registry, on January 31, 1995. (Id., at ¶ 13).

The Defendant, NHWA, was established in 1998 to promote the sound, natural gaited horse and eliminate the practice of soring. (Trial Transcript, at 59 (Docket No. 122)). NWHA has received Section 501(c)(3) non-profit status from the Internal Revenue Service for charitable, educational, and scientific purposes, specifically for the protection and advancement of a particular breed of horses. (Trial Transcript, at 335-36 (Docket No. 123)). When founded, the NWHA did not possess a database of pedigrees of the Tennessee Walking Horse. (First Stipulations, at ¶ 14).

In July, 2004, NWHA launched a registry on its website that provides ancestral lineage information for the registered member's Tennessee Walking Horse, as well as performance information regarding the horse (the "NWHA Registry"). (Id., at ¶¶ 15-16). NWHA issues certificates to owners of registered horses. Before launching the registry on its website, NHWA purchased software for $100 that contained pedigrees for 1,500 walking horses. (Trial Transcript, at 82-85 (Docket No. 122)). NHWA did not verify those pedigrees, but they currently appear on its website, with the exception of a few horses whose owners have specifically requested removal of their horse's pedigree form the website. (Id.)

From July, 2004 through December 25, 2005, NWHA's website stated that it accepted TWHBEA registration certificates from applicants seeking to register a horse with the NWHA

Registry. (First Stipulations, at ¶ 18). From July, 2004 through December 25, 2005, the NWHA

website stated:

> A. " NWHA is now accepting Tennessee Walking Horse Breeders and Exhibitors Association (TWHBEA) and Canadian Tennessee Walking Horse (CRTWH) registered Walking Horses with current registration papers for registration with NWHA."
>
> B. "Blood typing and parentage verification on horses that are currently registered with TWHBEA and CRTWH will be accepted."
>
> C. "A code will be added to every horse that is registered with NWHATR that will denote how each horse entered the registry. (Example: TWHBEA horses will carry the letter "T")."
>
> D. "Be sure to send copies of both sides of TWHBEA and CRTWH registration certificates with application to register with NWHA."
>
> E. "Copies of TWHBEA or CRTWH registration papers MUST accompany registration."

(Id., at ¶ 19).

NWHA has never asked TWHBEA for permission to use the TWHBEA trademarks or

the TWHBEA Registry. (Id., at ¶ 22).  On or about December 26, 2005, NHWA removed all

references to TWHBEA from its website, and added a disclaimer that TWHBEA did not endorse

or condone NWHA's use of TWHBEA's trademarks. (Id., at ¶ 24).

NWHA's application for registration has taken three different forms over time.  Its initial

application, used during the period from July, 2004 to December 25, 2005, required applicants to

submit a TWHBEA Registry Certificate or one from the Canadian Tennessee Walking Horse

Registry, with their application, and contained no space for listing the horse's pedigree. (Id., at ¶

21; Amended Second Set Of Stipulations, at p.2 of Exhibit C (Docket No. 117)(hereinafter

"Second Stipulations")).  The NHWA Certificate issued for a horse during that period added a

5

"T" next to the horse's name if the applicant had submitted a TWHBEA Certificate with the NHWA application. (Id.)  According to the parties, NHWA registered 163 horses upon receipt from the applicant of this initial application form and an attached TWHBEA Certificate. (Id.)

During the period from December 26, 2005 to January 21, 2007,[1] the NHWA application required that the applicant submit registration papers for horses currently registered "with a walking horse registry." (Id.)  According to the parties, NHWA registered 52 horses upon receipt from the applicant of this second application form and an attached TWHBEA Certificate. (Id.)

NHWA did not register any horses from January 21, 2007 through April 12, 2007.  (Id.) The current application, which came into use in April, 2007, requires that the applicant furnish the lineage information for both sire and dam of the horse and contains a space for pedigree information to be listed. (Id.)  By signing the application, the owner certifies that the pedigree information is accurate.  NWHA does not verify the pedigree information supplied by the owner. (Trial Transcript, at 116 (Docket No. 122)).  The application also has a space for listing the horse's registration number if registered with another walking horse registry.[2] (Plaintiff's Exhibit 3A, Tab 5).  NHWA has registered three horses using the current application form in which the applicants wrote out the pedigree information and did not attach a TWHBEA Certificate.

---

[1]  Plaintiff filed suit in this case on December 2, 2005 (Docket No. 1).  TWHBEA did not issue a cease and desist letter to NHWA asserting its claims prior to filing suit.  This Court issued summary judgment in favor of Plaintiff on the copyright claim on January 31, 2007 (Docket Nos. 51, 52).

[2]  The TWHBEA registration number is a unique designation that TWHBEA has historically assigned to its horses, such as "F-38", which designates a horse that was the 38th foundation horse in the TWHBEA Registry.

6

(Second Stipulations, p. 2 of Exhibit C). NHWA no longer accepts TWHBEA Certificates from applicants. (Trial Transcript, at 142-43 (Docket No. 122)).

Of the 226 horses that have been registered by NHWA, four have been accepted through a gait and conformation process that does not involve registration with another registry; three have been registered based on certificates from the Canadian Walking Horse Registry; one has been registered based on a certificate from the International Pleasure Walking Horse Registry; and three were registered with pedigree information handwritten on the application by the owner. (Second Stipulations, Exhibits B and C). The remaining horses were registered by copying pedigree information from a TWHBEA Registry Certificate provided by the owner with his or her NWHA Registry application. (Id.)

Twelve of sixteen of NWHA's founding directors were also sitting directors of TWHBEA and approximately all NWHA board members are current or former members of TWHBEA. (First Stipulations, at ¶¶ 26-27).

According to Wayne G. Hipsley, Defendant's expert, extending copyright information to a horse's pedigree would have a significant impact on the entire livestock industry and the purchase and sale of livestock where pedigree information is an important consideration (Trial Transcript, at 379 (Docket No. 123)). Mr. Hipsley pointed out that it would also be difficult for breed associations to police the use of pedigree information for these sales. (Id.)

From the inception of the NWHA Registry to the date of trial, NWHA received total revenue from the registry of $24,687, which included $13,583 it received from an auction for the first ten registry numbers. (Trial Transcript, at 334 (Docket No. 123)). The total expenses incurred by NHWA were $14,261.68. (Id.) NWHA realized a profit of $10,425.31, or a loss of

7

$3,157.68, if the auction income is not considered. (Id.)

B.  Conclusions of Law

    1.  Copyright Infringement

        (i)  Scope of the Injunction

In a Memorandum and Order issued on January 31, 2007, this Court ruled that Plaintiff is

entitled to summary judgment on its copyright infringement claim:

> In the present case, the Court finds that TWHBEA has demonstrated that
> the Registry and Registry Certificates possess the requisite level of originality in
> the selection and originality of material included therein to entitle the Registry
> and Registry Certificates to copyright protection.  More specifically, the
> undisputed facts show that TWHBEA has exercised creativity and has adopted
> unique and creative selection criteria in deciding which horses to include in its
> Registry, including the choices about what horses are pure bred Tennessee
> Walking Horses, the designation for foundation horses, and specific colors and
> markings of the Tennessee Walking Horse, all of which have evolved over time
> (Docket No. 43 at 1-3).  While the underlying facts regarding a particular horse or
> its lineage may not be subject to copyright protection, it is the way in which the
> facts have been expressed, selected and coordinated by TWHBEA in the Registry
> and Registry Certificates as a whole work of authorship that is original and
> subject to the protection of TWHBEA's copyright.
>
> Having determined that the Registry and Registry Certificates are
> sufficiently original to warrant copyright protection, the Court must next
> determine whether NWHA has copied any of the original elements of the Registry
> and/or Registry Certificates.  In the present case, the Court finds that the record
> before it shows that NWHA did not use independent selection criteria for
> inclusion of a horse in its NWHA Registry or that it simply copied raw facts about
> a horse's ancestry from TWHBEA Registry Certificates.  Rather, the Court finds
> that the undisputed facts show that NWHA has solicited TWHBEA Registry
> Certificates from applicants and copied almost verbatim from TWHBEA Registry
> Certificates (Docket No. 33, Ex. 2 and Docket No. 43 at 8).  As such, the Court
> finds that NWHA has infringed TWHBEA's copyright in its Registry and
> Registry Certificates in that each of TWHBEA's copyrighted Registry Certificates
> bears a portion of the copyrighted Registry.

(Memorandum, at 12-13 (Docket No. 51)).  The facts at trial support the summary judgment.

    The Court's opinion also noted:

Finally, with respect to NWHA's argument that the designation of TWHBEA's foundation stock, along with the names ascribed to such stock, passed into the public domain by operation of law many years ago, the Court finds that *TWHBEA is not asserting a copyright in the facts contained in the Registry, such as the ancestral lineage of the Tennessee Walking Horse or names, markings or colors of horses*, and has made no claim with respect to TWHBEA's first printed publication of its registry.  Rather, TWHBEA's asserted copyright is in the selection, coordination and arrangement of ideas in its current Registry as a whole and as an original work of authorship.

(Id., at 14).

In its summary judgment ruling, the Court reserved decision on any remedy for the copyright violation until the parties had an opportunity to discuss the terms of an injunction and the issue of damages (Id., at 14).  These issues were addressed at trial.

In addressing the scope of injunctive relief, the Plaintiff, at trial, "switched horses in the middle of the stream" and took the position that its copyright protects any publication of the pedigrees of TWHBEA-registered horses either when copied directly from the TWHBEA Certificate or when obtained indirectly through another source, such as the horse's owner.

NHWA contends that this pedigree information is not copyright protected because it is simply factual information used in Plaintiff's compilation.  NHWA is correct.

In Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 111 S. Ct. 1282, 1293, 113 L. Ed. 2d 358 (1991), the Supreme Court held that a compilation is not copyrightable per se, but is copyrightable only if its facts have been "'selected, coordinated, or arranged *in such a way that* the resulting work as a whole constitutes an original work of authorship.'" (quoting 17 U.S.C. §101)(emphasis in original).  Even if a compilation is found to be copyrightable, however, it receives only limited protection:

As § 103 makes clear, copyright is not a tool by which a compilation author may keep others from using the facts or data he or she has collected. . .  Rather, the

9

> facts contained in existing works may be freely copied because copyright protects
> only the elements that owe their origin to the compiler – the selection,
> coordination, and arrangement of facts.

111 S.Ct. at 1294-95. Applying these standards, the Court in <u>Feist</u> held that the plaintiff had a valid copyright in its telephone directory as a whole, but that the raw data comprising the white pages were uncopyrightable facts, and that the way in which plaintiff selected, coordinated, and arranged those facts was not original in any way. 111 S.Ct. at 1296-97.

In another copyright case involving the alleged infringement of an  associations' copyright in a registry of massage therapists, the District Court for the Northern District of Illinois held that the selection of information in plaintiff's registry was sufficiently creative to be eligible for copyright protection, but also found that the copyright would not extend to the underlying facts in the registry, the names and addresses of the therapists therein.  <u>American Massage Therapy Assoc. v. Maxwell Petersen Ass'n., Inc.</u>, 209 F. Supp. 2d 941, 948 (N.D. Ill. 2002).

Similarly, the District Court for the District of Maryland found that the plaintiff's MLS database possessed at least some minimal degree of creativity in that it contained marketing puffery that could not be characterized as factual, and an elaborate system of abbreviations in organizing its database. <u>Montgomery County Ass'n of Realtors v. Realty Photo Master Corp.</u>, 878 F.Supp. 804, 810-11 (D. Md. 1995).

Applying this authority to Plaintiff's request for injunctive relief, the Court concludes that NHWA should be enjoined from soliciting or referring to "TWHBEA Certificates," the "TWHBEA Registry," or TWHBEA registration numbers through its applications or websites. As the Court held in its Memorandum granting summary judgment on the copyright claim, the

Registry and the Registry Certificates, including the registration numbers assigned to horses in the Registry, are protected by Plaintiff's copyright.

On the other hand, the injunction does not extend to the "facts" of a particular horse's pedigree or ancestral lineage, or the horse's name, markings or colors. The Defendant is not prohibited by Defendant's copyright from requesting pedigree information from the horse's owner where that information does not refer to the TWHBEA Registry, TWHBEA Certificates, or TWHBEA registration numbers.

Accordingly, the Defendant shall return to the respective owners any TWHBEA Certificates contained in its files, along with all prior applications, and may permit those members to reapply for membership using an application form that complies with this Memorandum and accompanying Order.

As for the pedigree information Defendant obtained from a software vendor, which appears on its website, the Plaintiff has not addressed the issue of whether the software vendor violated Plaintiff's copyright in using the information, or whether Defendant's subsequent use of the information constitutes infringement. Therefore, Defendant's use of this information is not addressed by this Memorandum and Order.

(ii) Damages

Federal law provides for the recovery of damages by a copyright owner whose works have been infringed. 17 U.S.C. § 504. A copyright owner may elect to recover, instead of actual damages and profits, an award of statutory damages in a sum of not less than $750 or more than $30,000 as the court considers just. 17 U.S.C. § 504(c)(1). Plaintiff has elected to recover statutory damages in this case.

11

Plaintiff contends that it is entitled to damages of up to $150,000 based on Defendant's willful behavior. If the copyright owner proves, and the court finds, that the infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. 17 U.S.C. § 504(c)(2). Plaintiff claims that Defendant's infringement was committed willfully.

To prove willfulness, Plaintiff must show that Defendant had actual or constructive knowledge that it was infringing the Plaintiff's copyright or else acted in reckless disregard of the high probability that it was infringing Plaintiff's copyright. Zomba Enterprises, Inc. v. Panorama Records, Inc., 491 F.3d 574, 584-85 (6th Cir. 2007). To refute evidence of willful infringement, Defendant must not only establish its good faith belief in the innocence of its conduct, but it must also show that it was reasonable in holding such a belief. Id.

The Court finds that Defendant's infringement of Plaintiff's copyright in this case was willful. Defendant solicited and copied information directly from Plaintiff's Registry Certificates even though the Certificates had a copyright notice printed on them. Additionally, after suit was filed on December 2, 2005 and continuing until January 21, 2007, the Defendant accepted Plaintiff's Registry Certificates from its applicants. This conduct indicates that Defendant had constructive knowledge that it was infringing Plaintiff's copyright or that Defendant acted in reckless disregard of the high probability that it was infringing Plaintiff's copyright.

Furthermore, Defendant has not established a good faith belief in the innocence of its conduct or that it was reasonable in holding such a belief. Although Defendant may now argue that the copyright issue raised by this case is a complex one, there is no evidence that it

12

addressed the issue at all until suit was filed.

The Court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the maximum and minimum amounts. <u>Zomba</u>, 491 F.3d at 586. Many factors influence an award of statutory damages for copyright infringement, including the expenses saved and the profits earned by the defendant, the revenues lost by the plaintiff, the deterrent effect, if any, that such an award will have on the defendant and on third parties, the cooperation of the defendant in providing evidence concerning the value of the infringing material, the defendant's state of mind, and the conduct and attitudes of the parties. <u>Id</u>; <u>Peer Int'l Corp. V. Pausa Records, Inc.</u>, 909 F.2d 1332, 1336 (9th Cir. 1990).

In this case, as noted above, the Court is convinced that Defendant's infringing conduct was willful. On the other hand, the monetary amount of benefit to the Defendant and the damages to Plaintiff, if any, are not high.[3] The Court finds that the maximum statutory amount of $30,000 per work for "innocent" infringement is not sufficient in this case because of the willful nature of Defendant's conduct. The maximum statutory amount of $150,000 per work for willful infringement, on the other hand, is clearly excessive under the circumstances of this case. Therefore, the Court finds that Plaintiff is entitled to an award of $ 31,000 for the copyright

---

[3]  The evidence Plaintiff offered of actual damages is speculative at best. Proof that Plaintiff's revenues declined in certain years, standing alone, does not adequately establish that the decline was caused by the creation of Defendant's registry. Moreover, Plaintiff offered no proof that the decline in revenues was caused by specific walking horse owners' decisions to choose the Defendant's registry rather than the Plaintiff's registry. In fact, the evidence indicates that the overwhelming majority of the horses registered with the Defendant are also registered with the Plaintiff.  In addition, there was no evidence that the remaining horses that were registered based on their Canadian Registry Certificate or through gait and confirmation were even eligible for registration with the Plaintiff.  Finally, Plaintiff failed to rebut proof that the negative publicity surrounding the walking horse industry in recent years was a factor in its decline in revenues.

infringement that took place in this case.[4]

2. Trademark Infringement

The Plaintiff claims that the Defendant has infringed its trademark in violation of Section 1114 of the Lanham Act. Specifically, Plaintiff contends the infringement occurred when Defendant used Plaintiff's trademarked name or acronym on its website in announcing that it would accept TWHBEA Registry Certificates from applicants, and when Defendant used Plaintiff's trademark in certain of its advertising. Plaintiff also points out that Defendant did not include a disclaimer indicating that Plaintiff did not endorse or condone Defendant's use of Plaintiff's trademark.

The Defendant argues that there is no evidence of actual confusion in the marketplace from its use of Plaintiff's trademark on its website, that walking horse owners are sophisticated consumers likely to know the difference between TWHBEA and NWHA, and that its use of TWHBEA's acronym on its website constitutes fair use.

Section 1114 of the Lanham Act provides:

Any person who shall, without the consent of the registrant —

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or to cause mistake, or to deceive ..., shall be liable in a civil action by the

---

[4] The Court concludes, and the Plaintiff does not dispute, that for purposes of determining statutory damages under Section 504(c)(1), the TWHBEA Registry is classified as a compilation, and as such, constitutes one work. See, e.g., 18 U.S.C. § 504(c)(1) ("For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work."); XOOM, Inc. v. Imagineline, Inc., 323 F.3d 279, 285 (4th Cir. 2003)("Although parts of a compilation or derivative work may be 'regarded as independent works for other purposes,' for purposes of statutory damages, they constitute one work." (quoting H. Rep. No. 94-1476, at 162 (1976)).

14

registrant for the remedies hereinafter provided.

15 U.S.C. §1114.

"The touchstone of liability under §1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center, 109 F. 3d 275, 280 (6th Cir. 1997). The Sixth Circuit has identified the following factors to consider when determining whether actual confusion exists: (1) the strength of the senior mark; (2) the relatedness of the goods or services; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) the likelihood of expansion of the product lines. Id. See also Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc. of Steubenville, 670 F. 2d 642, 648 (6th Cir. 1982).

Applying these factors, the Sixth Circuit has explained, implies "no mathematical precision." 109 F.3d at 280. They are "simply a guide to help determine whether confusion is likely." Id. The "ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." Id.

In weighing these factors in light of the evidence presented at trial, the Court concludes that there is little or no evidence that Defendant's use of Plaintiff's trademarked name or acronym likely caused confusion among consumers regarding the origin of the services offered by the parties.

As for the first two factors, Defendant does not dispute that Plaintiff's trademark is distinctive and that the services each party offers are related. The similarity of the marks factor is

not a point of dispute either as Defendant concedes that Plaintiff's trademark actually appeared on its website.

Although Plaintiff attempted to establish at trial that consumers were actually confused by Defendant's use of Plaintiff's trademark, the evidence offered was speculative at best.[5] Nevertheless, as the courts have pointed out, lack of actual confusion is rarely significant. Id. at 284.

There also appears to be little dispute as to the fifth factor. The services offered by the parties target the same consumers – owners of gaited horses – and both parties appear to use similar marketing channels, including the internet.

There is a dispute between the parties regarding the sixth factor – the likely degree of purchaser care. The degree of care with which consumers likely purchase goods or services is usually measured against the typical buyer exercising ordinary caution. Id. A finding of enhanced purchaser care is proper when the buyer has expertise or is more sophisticated. Id. "The ultimate significance of a given degree of care, however, often will depend upon its relationship with the other seven factors." Id.

The Court concludes that this factor is very significant in this case and weighs heavily in favor of the Defendant. The evidence adduced at trial indicates that the customer base at issue here, owners of gaited horses, is very sophisticated in its ability to distinguish between the

---

[5] That a few horse owners asked Defendant to remove from the website the pedigree of that owner's horse, which was obtained from the software Defendant purchased, does not indicate that those owners were confused as to Defendant's affiliation with the Plaintiff. Indeed, such evidence just as likely indicates the contrary.

16

services offered by the Plaintiff and the Defendant.[6]  The cost of these horses is not inexpensive and potential users of the parties' services are likely to be individuals who have some minimal level of knowledge about the Tennessee Walking Horse industry or the equine industry in general.  As the evidence at trial indicates that the value of a horse is increased through certification, those seeking certifications from the parties are unlikely to do so casually.  Moreover, as the Plaintiff had approximately 98% of the market share for registered Tennessee Walking Horses, it is unlikely that these potential consumers would conclude that the Defendant would need to solicit TWHBEA Registry Certificates or information if it already had some affiliation with TWHBEA.   Thus, the Court concludes that this customer base is likely to exercise an enhanced degree of purchaser care in making decisions regarding the services offered by the parties, and is not likely to be confused about Defendant's affiliation with the Plaintiff.

The seventh factor to be considered by the Court is the Defendant's intent in using the Plaintiff's trademarked name or acronym.  As more fully discussed below, the Court concludes that Defendant's use of Plaintiff's trademark was to identify the Plaintiff's Registry Certificates, and not to create a likelihood of confusion with regard to affiliation with the Plaintiff.

Finally, the eighth factor to be considered by the Court in determining actual confusion is likelihood that either party will expand its product lines to compete with the other.  In the present case, this factor has little significance as the parties already compete in offering registration certificates for Tennessee Walking Horses.

---

[6]  The attempt by Plaintiff's board president to suggest that these consumers are "easily confused" (Trial Transcript, at 229-30 (Docket No. 123)) lacks credibility in light of all the other evidence adduced at trial.

Having weighed the factors, the Court finds that Plaintiff has failed to establish a likelihood of confusion regarding Defendant's use of its trademarked name or acronym. Defendant's use of Plaintiff's trademark was to identify the registration certificates it would accept for purposes of obtaining pedigree information for an applicant horse. The Court finds that Defendant's use of the trademark was unlikely to cause confusion on the part of consumers, and did not suggest any sponsorship or affiliation by the Plaintiff with the Defendant's services.

Alternatively, the Court concludes that the Defendant has established the defense of "fair use." The Lanham Act provides a defense to an infringement claim where the use of the trademark "is a use, otherwise than as a mark. . . which is descriptive of and used fairly and in good faith only to describe the goods . . . of such party. . ." 15 U.S.C. § 1115(b)(4); ETW Corp. V. Jirch Pub. Inc., 332 F.3d 915, 920 (6th Cir. 2003). "Under the doctrine of 'fair use', the holder of a trademark *cannot* prevent others from using the word that forms the trademark in its primary or descriptive sense." Id. (quoting Herman Miller, Inc. V. Palazzetti Imports and Exports, Inc., 270 F.3d 298, 319 (6th cir. 2001)). The fair use doctrine as applied in the trademark context "permits others to use a protected mark to describe aspects of their own goods." Id. In evaluating a defendant's fair use defense, a court must consider whether the defendant has used the mark: (1) to describe defendant's own goods; (2) in its descriptive sense; and (3) in good faith. Id.

The evidence presented at trial indicates that the Defendant used the Plaintiff's trademark in a descriptive sense to describe its own offerings – indicating the type of registration certificates it would accept in registering a horse. Whether the Defendant should have solicited Plaintiff's certificates has been addressed in the discussion of Plaintiff's copyright claim, but

18

referring to those certificates by using Plaintiff's trademarked name was the only way to describe Plaintiff's certificates, and as discussed above, it was not likely to cause confusion as to any affiliation with the Plaintiff.

For these reasons, Plaintiff's trademark infringement claim is dismissed.

3. Unfair Competition Claims

The Plaintiff has also raised unfair competition claims under Section 1125(a) of the Lanham Act, Federal common law and the TCPA. As Plaintiff concedes, like the claim for trademark infringement under the Lanham Act, each of these causes of action requires proof of likelihood of confusion. Daddy's Junky Music, 109 F. 3d at 288; Wynn Oil Co. V. American Way Serv. Corp., 943 F.2d 595, 604-05 (6th Cir. 1991); Frisch's Restaurants, Inc., 670 F. 2d at 647; McDonald's Corp, v. Shop at Home, Inc., 82 F. Supp. 2d 801, 816-817 (M.D. Tenn. 2000). For the same reasons the Court found no likelihood of confusion under the trademark infringement claim, the Court also finds no likelihood of confusion with regard to these claims. Accordingly, these claims are dismissed.

4. Trademark Dilution

Plaintiff has also raised a claim for trademark dilution under Section 1125(c) of the Lanham Act. Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods and services." Kellogg Co. v. Toucan Golf, Inc., 337 F. 3d 616, 627 (6th Cir. 2003). Unlike traditional trademark infringement, it does not exist to protect the public, but only "to protect the quasi-property rights a holder has in maintaining the integrity and distinctiveness of his mark." Id., at 628.

The Sixth Circuit has held that in order to establish a prima facie case of trademark

dilution, the senior mark must be: (1) famous; and (2) distinctive, and the junior mark must: (3) be in commerce; (4) have begun subsequent to the senior mark becoming famous; and (5) cause dilution of the distinctive quality of the senior mark.  Kellogg Co., 337 F. 3d at 628.  In Mosely v. V Secret Catalogue, Inc., 537 U.S. 418, 123 S. Ct. 1115, 155 L. Ed. 2d 1 (2003), the Supreme Court recognized that proof of dilution under Section 1125(c) requires a showing of  actual dilution.  V Secret, 123 S. Ct. at 1117.[7]  The Supreme Court also held that proof of actual dilution may be difficult to obtain, and noted that circumstantial evidence can be used to show actual dilution under certain circumstances, such as the obvious case when the marks are identical. V Secret, 123 S. Ct. at 1125.

With regard to actual dilution, Plaintiff claims that Defendant's use of Plaintiff's trademark in its advertising, web pages and on its registry application diluted the mark.  As discussed above, Defendant used the Plaintiff's trademark to identify the registration certificates it would accept for purposes of registering an applicant horse.  To support its claim of dilution, Plaintiff essentially contends that the pedigree information Defendant records for a particular horse is not verified to the same extent as that recorded by the Plaintiff for its member horses, and therefore, Defendant's use of its trademark diluted it.

The Court is not persuaded that Defendant's alleged sloppy business practices lessened the capacity of Plaintiff's trademark to identify and distinguish its goods and services.  It is

_____

[7]  After this lawsuit was filed, Congress amended the Trademark Dilution Act by permitting a plaintiff to obtain injunctive relief upon a showing of likely dilution, rather than actual dilution. Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, 120 Stat. 1730. Plaintiff does not contend that this amendment applies to this case.  See also Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, ___ F.3d ___, 2007 WL 3348013 (4th Cir. 2007).

equally arguable that the alleged inferiority of Defendant's pedigree verification process actually enhanced the integrity of Plaintiff's trademark. In any event, Plaintiff has failed to establish that Defendant's use of its trademark caused any dilution of the mark. Plaintiff's trademark dilution claim is dismissed.

5. <u>Intentional Interference With Business Relations</u>

Finally, Plaintiff asserts a claim for intentional interference with business relations under Tennessee law. Under Tennessee law, in order to establish a prima facie case of intentional interference with business relations, a plaintiff must show: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. <u>Trau-Med of America, Inc. v. Allstate Ins. Co.</u>, 71 S.W. 3d 691, 701 (Tenn. 2002).

The Court finds that Plaintiff has not carried its burden of proof to establish this claim as there was insufficient evidence that Defendant used improper means to interfere with the relationship between the Plaintiff and its membership. Competing with a business for customers is all-American capitalism and is not the same as using improper means to interfere with the relationship between that business and its customers. Moreover, Plaintiff has not presented any non-speculative evidence that it suffered damages from any alleged tortious interference in this case.[8]

---

[8] See discussion in footnote 3.

Case 1:05-cv-00088   Document 127   Filed 12/12/07   Page 21 of 22 PageID #: 2545

### III. Conclusion

For the reasons set forth above, the Court enters judgment in favor of the Plaintiff on the copyright claim, and judgment in favor of the Defendant on all other claims.

On the copyright claim, Plaintiff is awarded statutory damages in the amount of $31,000. In addition, Defendant is enjoined from soliciting or referring to the "TWHBEA Registry," "TWHBEA Certificates" or TWHBEA registration numbers through its applications or websites. The Defendant is not enjoined from requesting pedigree information from an applicant where that information does not refer to the TWHBEA Registry, TWHBEA Certificates, or TWHBEA registration numbers. Defendant shall return to the respective owners any TWHBEA Certificates contained in its files, along with all prior applications, and may permit those members to reapply for membership using an application form that complies with this Memorandum and accompanying Order.

It is so ORDERED.


_Todd Campbell_
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE

Case 1:05-cv-00088   Document 127   Filed 12/12/07   Page 22 of 22 PageID #: 2546